1   **MICHAEL R. BARRETTE (SBN 89017)**
    **ATTORNEY AND COUNSELOR AT LAW**
2   **990 Klamath Lane, Suite 20**
    **Yuba City, CA 95993**
3   **(530) 674-5996 – Telephone**
    **(530) 674-7886 – Facsimile**
4   *mbarrettelaw@yahoo.com*

5   Attorney for Defendant, Harminder Phagura

6

7

8                   **IN THE UNITED STATES DISTRICT COURT**

9                   **EASTERN DISTRICT OF CALIFORNIA**

10  **UNITED STATES OF AMERICA,**              **CASE NO.:  2:15-CR-00095-GEB**

11              Plaintiff,                     **OBJECTIONS OF THE DEFENDANT**
                                               **HARMINDER S. PHAGURA TO THE**
12      vs.                                    **FORMAL PRESENTENCE**
                                               **INVESTIGATION REPORT AND**
13                                             **SENTENCING MEMORANDUM**
                                               **(FRCrim.P., rule 32(f); Eastern District**
14  **HARMINDER PHAGURA,**                     **Local Rule 460, subd. (e).)**

            Defendant.
15                                             **Date:     November 18, 2016**
                                               **Time:     9:00 a.m.**
16                                          /  **Dept.:    Courtroom 10, 13th Floor**
                                                          **Honorable Garland E. Burrell**
17  _____

18          Defendant HARMINDER S. PHAGURA (**"Harminder"**)[1], through his counsel, hereby

19  submits his Objections to the Formal Presentence Investigation Report ("PSR") and Sentencing

20  Memorandum. This document is divided into the following sections (1) Introduction (2) Legal

21  Standards Applicable to the Sentencing Decision (3) Objections to the Presentence

22  Investigation Report, and (4) 18 USC §3553 factors.

23                          **1.  INTRODUCTION**

24          **Harminder** was employed as a Yuba City Police Officer as a rank and file officer,

25  holding no supervisory position. Common to police officers, he takes friends and interested

26  _____

27  [1]  Codefendants Harminder S. Phagura and Gursharan S. Phagura share the same last name, although they are unrelated by
    blood or marriage. In this document, to avoid confusion, each will be referred to by their first name or nickname. No
28  disrespect is intended.

_____

LAW OFFICES OF                                 OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                            SENTENCING MEMORANDUM

                                  1

community members on "ride-alongs" in his police cruiser to see "first hand" the daily life of a police officer.  Harminder's lifelong friend Gursharan Phagura ("**Rocky**") is older than Harminder and was a mentor figure to **Harminder** all of his life. **Rocky** held a six-figure income job and by all appearances was a pillar of the community.  Unbeknownst to even one of his closest friends, Rocky led a secret life as a drug dealer. **Rocky** began to use his friendship with **Harminder** to help facilitate his clandestine occupation. He wanted to create the façade to his drug confederates that he had a "dirty cop" protecting his drug deals. To Harminder, at first, Rocky's actions were innocuous. **Harminder** suspected nothing when Rocky wanted to go on a "ride-along" in his police cruiser and asked a lot of questions about what certain things and codes meant on the police cruiser's computer as layperson questions about police procedures were common on "ride-alongs".

Rocky had also wanted to know a certain license number because someone had tried to "run him off the road". To a police officer, this was a common request and usually would be handled by locating the offender and giving him a stern warning. Secretly, **Rocky** bragged to his associates that he had a cop "in his back pocket." It was much easier to get drug connections to trust him if he had police protection. **Rocky** was overstating what he had to better facilitate his dealings. Of course, unknown to **Rocky**, he was during all this time dealing with a confidential informant ("CI") reporting his every move to authorities. During the "ride-along", Rocky is texting his confederates regarding what he believes to be a real drug deal, but is really just a simulated drug buy. **Rocky** and **Harminder** are surreptitiously tailed in the police cruiser and the authorities suspect, Harminder is facilitating this "deal". However, at this point, **Harminder** is just an innocent dupe being used by his friend.

This later changed. Rocky "came out" and told Harminder that he needed his help to make it appear to his "friends" that Rocky had access to sensitive police information. **Rocky** asked him to meet with him and his "friends" at a Yuba City restaurant Taqueria Guadalajara. Rocky offered Harminder $2500.00 to attend the meeting and "make it appear" that he was proving police intelligence and to just "go along" with the discussion. Harminder told Rocky that he does not need money, but agrees to help in the guise at the meeting at Taqueria

Guadalajara on March 8, 2015, where the CI wearing a wiretap, Rocky and Harminder are present. A recording is created.  Due to the din of the busy restaurant, the conversation is extremely difficult to hear on the recording. Most of the conversation is small talk about various subjects. About 22 minutes into the recording, Rocky brings up to Harminder, "what I talked to you about". A hypothetical discussion ensues about stealing money from buyers after a drug transaction. Harminder dismisses this as not practical without another cop "being in on it, in case backup came to the scene". The discussion turns to DEA and NET-5 (the local drug enforcement agency) procedures, the CI asks how this works. Harminder outlines that when DEA works in the local area, that local authorities are notified.[1] The conversation turns to Harminder's access to records at NET-5 to check on the activities of Rocky's confederates. As he had promised Rocky, Harminder tells a story about how he needs to testify in a case in a few days and will be going to NET-5 to review that case, so he can easily check. This is again, just "talk" as Harminder had no such case, had not been to the NET-5 office in months and never went as he had represented he would. Harminder was just "going along" as Rocky had asked him to do. No specific drugs, transactions, quantities or future contemplated transactions are ever discussed in this recording. The only other statement where Harminder kept up the illusion is when he states in the vaguest generalities, "Let me know guys. Whatever you need, I will do whatever I can do to help." The talk then turns to small talk again and nothing of any substance is discussed again in the recording. Everything said during the meeting by Harminder was in vague generalities.

While Rocky continued to accept money from the CI for supposedly supplying "protection", Harminder refused any money from Rocky. The government has no evidence that Harminder had ever accepted money other than the double hearsay of the CI reporting that Rocky had told him he had given money to Harminder.

---

[1] While not diminishing the fact that at this time Harminder is complicit in Rocky's façade of police "protection", this fact itself is hardly sensitive or a secret. One can glean this information from watching typical police shows or Hollywood movies such as U.S. Marshals where the protagonist federal marshal, played by Tommy Lee Jones, first cooperates with local authorities to find an escaped federal prisoner. Then, when his level of competence is not met at the local level, he seizes control of the investigation.

LAW OFFICES OF                                          OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                              SENTENCING MEMORANDUM

## 2. <u>STANDARDS APPLICABLE TO THE SENTENCING DECISION</u>

In *United States v. Booker* (2005) 125 S.Ct. 738, the United States Supreme Court restored to sentencing judges their power to use their own discretion in determining appropriate sentences. The Fourth Circuit held: "In the wake of *Booker*….the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines. Nevertheless, a sentencing court is still required to consult the guidelines and take them into account when sentencing. (*Id.* at 767.)  Consistent with the remedial scheme set forth in *Booker*, a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553 before imposing the sentence. (*Id.* at 764-765.) If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so. In light of the excision of §3742(e) by the Supreme Court, we will affirm the sentence imposed as long as it is within the statutorily prescribed range, see *Apprendi*, 5301 U.S. at 490, and is reasonable, see *Booker*, 125 S. Ct. at 767." *United States v. Hughes* (4th Cir. 2005) 401 F.3d 540, 547.)

When a court makes findings of fact, the Guidelines in § 6A1.3. Resolution of Disputed Factors (Policy Statement) state:

"(a)  When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, **provided that the information has sufficient indicia of reliability to support its probable accuracy.**

(b)  The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P." (Emphasis supplied.)

Within the rubric of sufficient reliability, the Commentary section under the quoted Guideline provides:

"Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy. *Watts*, 519 U.S. at 157; *Nichols*, 511 U.S. at 748; *United States v. Zuleta-Alvarez*, 922 F.2d 33 (1st Cir. 1990), cert. denied, 500 U.S. 927 (1991); *United States v. Beaulieu*, 893 F.2d 1177 (10th Cir.), cert. denied, 497 U.S. 1038 (1990). Reliable hearsay evidence may be considered. *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993), cert. denied, 510 U.S. 1040 (1994); *United States v. Sc*iarrino, 884 F.2d 95 (3d Cir.), cert. denied, 493 U.S. 997 (1989). **Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means.** *United States v. Rogers*, 1 F.3d 341 (5th Cir. 1993); see also *United States v. Young*, 981 F.2d 180 (5th Cir.), cert. denied, 508 U.S. 980 (1993); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir. 1978), cert. denied, 444 U.S. 1073 (1980). Unreliable allegations shall not be considered. *United States v. Ortiz*, 993 F.2d 204 (10th Cir. 1993)." (Emphasis supplied.)

A defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information. Hearsay evidence in a presentence report, standing alone is usually insufficient without corroboration under circumstances indicating its reliability. (*United States v. Petty*, 982 F.2d 1365, 1368-1370 (9th Cir. 1993)

In considering information relevant to the charge for which the defendant is convicted, the facts surrounding the convicted charge need only be found by the court by a preponderance of the evidence. (*United States v. Gill,* 280 F.3d 923, 931 (9th Cir. 2002) However, when considering facts that go to sentencing facts that are outside the charges for which the defendant is convicted, when those facts would result in a sentencing factor that would have a "disproportionate effect" on the sentence relative to the offense of conviction, due process requires that this conduct be found by the sentencing court based upon a higher standard of "clear and convincing evidence" to support the sentence imposed. (*United States v. Hymas*, 780 F.3d 1285, 1289-1290 (9th Cir. 2015). Under a totality of the circumstances test, six factors guide the determination of whether a sentencing factor has a disproportionate impact on the sentence:

---

"(1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence." (*Ibid.*)

### 3. <u>SUMMARY OF OBJECTIONS</u>

The government dismissed by its plea bargain any charges that they could prove Harminder ever conspired to facilitate any particular drug transactions involving any particular drug, let alone cocaine, as charged in the Indictment, or any particular quantity of any drug. By accepting a plea to Federal Programs Bribery, the government eschewed any attempt to show that any such conduct by Harminder was "relevant conduct" as "(i) within the scope of the jointly undertaken criminal activity", (ii) "in furtherance of that criminal activity, and", (iii) reasonably foreseeable with regard to the criminal activity; that occurred during the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . ." (U.S.S.G. §1B1.3(a)(1)(B). In the plea bargain, both the government and Harminder's attorney calculated the offense level under the sentencing guidelines as a Level 13, with a Guideline incarceration range of 12-18 months. The government bound itself to recommend 18 months imprisonment.  The Factual Basis for the Plea makes no mention of the drug "cocaine" nor any quantities that the defendant ever agreed to help assist or facilitate. The government also promised not to seek or argue any other specific offense characteristics.

Undeterred, the probation officer ignores the Factual Basis in the plea bargain and the evidence discussed above and improperly calculates the Offense Level as if the defendant is fully responsible for all resulting conspiracies to sell cocaine as being directly involved in them,

knowing and agreeing to specific quantities of at least 3 kilos. The practical result is the same as if the defendant had simply pled guilty to the entire Indictment! The probation officer relies on uncorroborated hearsay to escalate the resulting Guideline calculation form a Level 13 to a Level 23 with a recommendation of 51 months, or almost 3 times the recommendation of the Government.  The probation officer also improperly assigns to Harminder the badge of being in a "sensitive" position. (U.S.S.G. §2C.1(b)(3). Harminder objects to numerous facts that rely on uncorroborated hearsay or are otherwise inaccurate and states whether the applicable standard as to those facts is preponderance of the evidence of clear and convincing evidence. . The defendant's objections are set forth below. Direct reference is made to the numbered paragraphs of the PSR.

**The Offense Conduct-As to Harminder Phagura**

¶7.  **Entire Paragraph.**

    A.  **<u>Objection:</u>** The statements in this paragraph are double hearsay--what Rocky allegedly said to the CI as relayed to the investigative officers by only the CI. This information is not corroborated as of this time period as there is no corroborating evidence to connect Harminder in participating with Rocky at this time. The paragraph is misleading and incomplete because, according to the same hearsay statement of the CI, Rocky's exaggerated braggadocio also claimed that Harminder had DEA agent friends who he went to school with that would also help in these discussed narcotics transactions as longtime friends that were DEA Agents in the Sacramento area. This puffery was never shown to be true by the evidence. This paragraph is misleading as there was never any evidence to tie in Harminder with Rocky's bragging. There is no evidence to attribute the statements of Rocky to Harminder, factually or otherwise. At this point, Rocky was just being a good salesman and puffing his own self-value. The Probation Officer in his response to defendant's objections indicated that he concluded that the CI or Rocky was being untruthful about the connection to DEA agents so he merely omitted this information from his report. However, evidence that is shown to be false, when considered with

other evidence that is never corroborated shows even further that the evidence relied upon should be considered unreliable hearsay.

**B. Standard of Proof:**  Clear and Convincing Evidence.

**C. Requested Remedy or Finding:** Defendant requests the Court ignore the uncorroborated hearsay of the CI as to any involvement of Harminder  with any drug deals with Rocky as of March 1, 2014 and find the evidence is unreliable and uncorroborated.

**D. Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶10 Entire Paragraph**

**A. Objection:** This paragraph is misleading and does not establish evidence that Harminder specifically agreed to assist in any "fake" narcotics transaction on that day, let alone that he knew the specie or quantity of the fake drug transaction. The paragraph omits critical information from the day before. On July 28, 2014, Gursharan told federal agents that he would be in Harminder's patrol car the next day, thus demonstrating that he knew he would be on a "ride-along" in advance, again to give reality to his façade of using a Yuba City Police Officer to conduct a narcotics transaction. (Inv. Report Bates page 737) There is no evidence of Harminder's involvement in the fake drug transaction other than Rocky's presence in his car and Rocky foretelling his own actions. Rocky had already been told what a Code 5 meant on the computer so it was easy for him to convey what information he read on the screen of the computer in the patrol vehicle. Further, when the CI was debriefed about the recorded conversation of July 28, 2014, he did not state Rocky had told him was going on a "ride-along". The investigating agent only noted Rocky had said that in his report the next day when he listened to the tape recorded

---

conversation. Due to his close friendship with Harminder, it was easy for Rocky to ride in a police vehicle and feign a "cop in his pocket". There is no evidence to corroborate the hearsay of the CI that Harminder knew of the drug transaction, knew anything other than this circumstance of Rocky being in his car.

**B.  Standard of Proof:**  Clear and Convincing Evidence.

**C.  Requested Remedy or Finding**: That the Defendant was present and what occurred is within the stipulated facts of the plea bargain. Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder with any fake drug deal with Rocky as of July 28, 2014 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

**D.  Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶11.  Entire Paragraph**

    A.  **Objection:** Same objection as ¶10 above. Again, the information about what Harminder was allegedly telling Rocky in the police car is double hearsay provided by the CI. The only corroboration is the fact that Rocky is in the police car, a fact that he already knew in advance and is not corroboration. There is no other corroboration through recordings text messages, conversations or anything that connects Harminder with any fake drug transaction committed on July 29, 2014. There is no evidence again that Harminder knew and agreed to what drugs were involved in the fake drug transaction or any quantity thereof.  In addition, the claim that Harminder *used* "counter surveillance" in the college parking lot is misleading and unsupported conclusion. Factually, what occurred was Harminder was

observed to drive his vehicle into the college parking lot, down a dirt road into an orchard and turn around and return the way it came. Harminder and other Yuba City Police Officers knew the property owner and frequently use this area for rest breaks and position while awaiting a dispatch call in their "beat". In the actual police report, the description of this activity was "*possible*" counter-surveillance. Of course, it could be a myriad of other innocent explanations.

**B.  Standard of Proof:**  Clear and Convincing Evidence.

**C.  Requested Remedy or Finding**: That the Defendant was present and what occurred is within the stipulated facts of the plea bargain. Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder  with any fake drug deal with Rocky as of July 28, 2014 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

**D.  Effect on Sentence**:  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶12.  Entire Paragraph**

A.  **Objection:** Same objection as ¶¶10-11 above. It is misleading to state that it was *confirmed* that Rocky had shared the $2000.00 payment with Harminder. The only confirmation of that fact again comes from a text from Rocky only to the CI. No evidence shows any payment of money from Rocky to Harminder.

**B.  Standard of Proof:**  Clear and Convincing Evidence.

**C.  Requested Remedy or Finding**: That the Defendant was present and what occurred is within the stipulated facts of the plea bargain. Defendant requests the

LAW OFFICES OF                                             OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                                 SENTENCING MEMORANDUM

Court ignore the uncorroborated hearsay of the CI of involvement of Harminder with any fake drug deal with Rocky as of July 28, 2014 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated. Also, that the Court ignore the uncorroborated hearsay that Rocky paid Harminder anything.

**D.  Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶14  "Harminder and Gursharan spoke about the simulated narcotics transaction, federal law enforcement in the area, and the meeting spot."**

A.  **Objection:** The intercepted phone call on that date spoke of none of these things. In an interpreted Punjabi language telephone call, pleasantries are exchanged "How is everything?" "Everything is good." "That is finished" "I send that over to you later today." The Probation Officer responds about a conversation about being at the "gym", but the police report shows that took place the day before on February 17, 2015. (Bates Stamp 679.) There is no discussion during this intercepted telephone call about drugs, type of drugs, quantities of drugs or similar information.

**B.  Standard of Proof:**  Clear and Convincing Evidence.

**C.  Requested Remedy or Finding**:  Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder  with any fake drug deal with Rocky as of February 18,  2015 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

**D.  Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG

LAW OFFICES OF                                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                                     SENTENCING MEMORANDUM

§2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶15 Entire Paragraph**

**A. Objection:** This paragraph is misleading and omits critical information. The day before, a phone call is intercepted by agents between Rocky and Harminder where Rocky invites Harminder to go to lunch with his buddy. While the CI was given $2000.00 to give to Rocky and Harminder, in debriefing the CI stated he gave the money only to Rocky. There is absolutely no evidence that Rocky "seemingly paid Harminder." Moreover, the paragraph contains uncorroborated hearsay from the CI that "Harminder admitted in assisting in the narcotics deal that occurred on July 29, 2014." There is zero independent evidence to corroborate this information. The statement attributed to the CI that Harminder knew he was providing assistance for a "cocaine" transaction is also uncorroborated hearsay. The recorded conversation is unintelligible and provides no evidence to support these hearsay assertions. Also, that the Court ignore the uncorroborated hearsay that Rocky paid Harminder anything.

**B. Standard of Proof**: Clear and Convincing Evidence.

**C. Requested Remedy or Finding:** Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder  with any fake drug deal with Rocky as of February 18,  2015 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

**D.  Effect on Sentence**:  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

LAW OFFICES OF                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                        SENTENCING MEMORANDUM

¶16 **Entire Paragraph**

    A. **Objection:**  This paragraph is misleading and omits critical information. Harminder is never present for this meeting between the CI and Rocky at the Yard House Restaurant in Roseville. Again, this is double hearsay of the CI relating Rocky bragging about what Harminder is going to do in this discussed transaction, but there is never any evidence that connects Harminder with any of Rocky's representations of what Harminder will or will not do or involvement or knowledge about this transaction.

    **B.  Standard of Proof**:  Clear and Convincing Evidence.

    **C.  Requested Remedy or Finding:** Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder  with any fake drug deal with Rocky as of February 28,  2015 in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

    **D.  Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

¶17   **Entire Paragraph**

    A. **Objection:**  This paragraph is misleading and omits critical information. CI is told to put the $2,000.00 in the food bag, but is never observed to do so nor searched by law enforcement after the transaction. Rocky is observed to leave the restaurant with the "white plastic" food bag and get into a car with Harminder, carrying a food bag from the restaurant. Together, they drive to Harminder's residence and Rocky leaves in the car from there. Harminder is seen taking a "similar" bag into the house. No evidence establishes that any money was in the food bag Harminder took into the house.

**B.  Standard of Proof:**  Preponderance of the Evidence.

**C.  Requested Remedy or Finding**: Defendant requests the Court ignore the speculative claim that Rocky paid Harminder any money.

**D.  Effect on Sentence**:  Admittedly, this will have minimal impact on the sentence, but will affect evaluation of 18 USC §3553 factors if Harminder can dispel the suggestion of the Probation Officer that he acted out of "greed".

¶18  **"On March 8, 2015, the CI met with Gursharan and Harminder at the same restaurant. They discussed negotiating a future kilogram quantity cocaine transaction and future similar narcotics transactions in which Harminder and/or another officer would provide counter surveillance or intelligence."**

A. **Objection:**  The CI was wired and the entire conversation was recorded. There was never a discussion of cocaine transactions; the word "cocaine" is never uttered by anyone. There were no discussions of future drug transactions, only in the most general, hypothetical sense. There was no discussion of kilogram quantities of any kind. After the defense objection to the Draft Report on this ground, the Probation Officer responds that, "I was not provided with the recorded conversation. . ." This is a complete abdication of the independent role of a Probation Officer. Under the Guide to Judiciary Policy, §330.35(b), a Probation Officer is cautioned, "A simple recitation of the government's version of the events is inconsistent with the independent nature of this section." Thus, when confronted with the defendant's objection that such information is not contained in a recorded conversation of the event, the Probation Officer, at a minimum should have requested from the prosecution or defense a copy of the recording to determine for himself whether the report is accurate. The CI's statement to investigators that procuring kilograms of cocaine was discussed as they were leaving the restaurant is uncorroborated hearsay. It is not only uncorroborated, but is actually belied by the recording because no such conversation exists. It is

LAW OFFICES OF                                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                                      SENTENCING MEMORANDUM

reckless of the Probation Officer to simply take the police reports version of this important matter. The Probation Officer has likewise failed the Court in his duty to independently investigate this matter and could have easily resolved this controversy. Instead, the Probation Officer shirked his duty of independent investigation and just dumps the controversy in the Court's lap. Absent concession by the government on this point, the Court will be provided with a copy of the recording to hear. The Court is cautioned that the din of the restaurant makes the recording extremely difficult to hear. Defense counsel was only able to discern what was said using a good set of Bose noise canceling headphones.

**B.  Standard of Proof:**  Clear and Convincing Evidence.

**C.  Requested Remedy or Finding:** Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder  with any discussions with on March 8, 2015, in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug  and find the evidence is unreliable and uncorroborated.

**D.  Effect on Sentence:**  This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of  USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

**¶18  "He could help out with anything in regard to providing counter surveillance or intelligence in future simulated narcotic transactions as long as the services coincided with his abilities as an officer. The CI and Gursharan spoke about obtaining kilograms of cocaine the following week. Gursharan told the CI he was working· on it.   Harminder was  present  during  this conversation."**

> **A.  <u>Objection:</u> Same objection as above.** No specific future transactions were discussed. Harminder near the end of the recording is heard to say**, "Let me

know guys. Whatever you need, I will do whatever I can do to help." This is stated in the very general sense going along with what Rocky had asked him to do, but did not establish any particular agreement to do anything. Again, the entire conversation is recorded until the CI is heard to get into his car and start the engine. There is never a conversation about cocaine or kilograms on that recording. The police report documents that the CI says there was, but the recording belies that assertion.

**B. Standard of Proof:** Clear and Convincing Evidence.

**C. Requested Remedy or Finding:** Defendant requests the Court ignore the uncorroborated hearsay of the CI of involvement of Harminder with any discussions with on March 8, 2015, in terms of knowledge of any specie of drug involved or agreed to any quantities of that drug and find the evidence is unreliable and uncorroborated.

**D. Effect on Sentence:** This finding is one of many the Probation Officer uses as a link in a chain to conclude that the crossover provision of USSG §2C1.1(c)(1) applies as Relevant Conduct to this offense and increasing the defendant's Guideline calculations for conspiracy to distribute cocaine accountable for 3 kilograms under Guideline 2D1.1(c)(7).

## Adjustment for Acceptance of Responsibility

¶23 "**His statement appears somewhat at odds with the investigative reports by his denial that he was not aware of any illegal activities being pursued by the codefendant in this case and that he did not accept any monetary compensation from the codefendant.**"

**Objection:** This statement mischaracterizes the Defendant's Statement Regarding Offense supplied to the Probation officer. In that statement Harminder states he was *initially* unaware that Rocky was pursuing illegal activities. He goes on to accept responsibility once Rocky offered him money to carry out the façade of having a cop in his back pocket and accepted full responsibility for his acts that led to this conviction. Nor is Harminder's denial of ever accepting a dime from Rocky "at odds" with the investigative reports. No evidence shows

LAW OFFICES OF
MICHAEL R. BARRETTE

Harminder ever receiving money from Rocky of the $6,000.00 paid by the CI to Rocky. Harminder accepts "responsibility" for this money, in the sense that since Rocky had offered him money, it was reasonably foreseeable that if he helped Rocky that Rocky might be paid for that help. However, Harminder steadfastly maintains he acted solely for his love and affection for Rocky and their relationship and not for money.

As a matter of law, to receive credit for "Acceptance of Responsibility", a defendant is not required to admit anything that is not within the conduct of the crime for which the defendant is convicted and any additional conduct for which the defendant is accountable. (U.S.S.G. §3.E1.1, *Application Note* 1.(A). Under the crime for which the defendant pled guilty, it is not necessary that money be the motivating force or "bribe" for the defendant to act as he did.  The statute prohibits accepting or agreeing to accept "anything of value" for the corrupt act. (*Salinas v. United States* (1997) 522 U.S. 52, 57. "Anything of value" has been judicially construed to mean intangibles as well as tangibles such as money or property, an is broadly construed to include just about anything one values such as information, promises of sexual intercourse, conjugal visits otherwise not allowed, even something that the defendant believed had value, but turned out to be worthless. (*See United States v. Marmolejo* (1996, 5th Dist.) 89 F.3d 1185, 1192-1193 and cases collected therein.) Thus, under the elements of the offense, it was not necessary for this element that the defendant received money, his motivation for acting for the love, affection and friendship of Rocky and the providing of sensitive police information was sufficient for that purpose. The statute also requires that the transaction involve "any thing of value of $ 5,000 or more." There is no requirement that either the payor or payee of the bribe value the transaction at $5,000.00. Courts are free to use traditional valuation methods such as looking at what a willing person would pay for the thing bargained for. (*Ibid.*) Here, $6,000.00 was paid for the belief by the payors that they were being provided with police protection. Thus, neither element requires the defendant to have actually received any part of the $6,000.00 actually paid.

///

**Offense Level Computation**

Harminder adopts the Offense Level Computation set forth in the Plea Bargain on page 6 at ¶VI.B as the correct calculations and objects to the below findings of the Probation Officer.

¶25.    The Probation Officer improperly uses USSG §2C1.1(c)(1) to calculate a Guideline calculation for conspiracy to distribute cocaine accountable for 3 kilograms, as further discussed below.

¶27.    The Probation Officer improperly adds an offense level increase of 4 levels pursuant to USSG §2C1.1(b)(3) for Harminder being "a public official in a high-level decision-making or sensitive position."  The Probation Officer separates out the disjunctive "or" and concludes that the position being "sensitive" in and of itself.  However, the definition of "a public official in a high-level decision-making or sensitive position," "means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." (*Application Notes* 4.(A). The Notes then go on to give an examples, which include " a law enforcement officer". The Probation Officer simply concludes, with no factual analysis, that since Harminder was a police officer, that all police officers are subject to this increase automatically.[1]  (*United States v. Richards* (2012, 3rd Cir.) 674 F.3d 215 holds that the analysis is a fact-based one, looking at the particular responsibilities of the particular job of the public official involved. (*Id.* at p. 221.) On the other hand, another court has taken the position that correctional officers are akin to law enforcement officers and the very nature of the position makes it "sensitive". (*United States v. Dodd* (2014) 770 F.3d 306, 311-312; *United States v. Snell* (1998) 152 F.3d 345 [same status only as to jurors].)

Defendant contends the increase is inapplicable to his mere status as a police officer. If it were otherwise, then the defendant would be erroneously "double-counted" merely for his

---

[1]  By the same leap in logic one could observe, "It is raining, therefore the ground is wet." However, one could not observe, "The ground is wet, therefore it is raining." Not all rank and file police officers, regardless of their duties, occupy positions to allow them to make decisions for their agency or substantial influence of the decision making process.

LAW OFFICES OF                                          OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                               SENTENCING MEMORANDUM

status as a police officer. The Base Offense Level for this offense is Level 12. However, if the defendant is a "public official", the correct Base Offense Level is Level 14. (USSG §2.C1.1(a).) The only thing that makes the defendant a "public official" is because he is a police officer. (*Application Notes-Definitions* (c).) Thus, the defendant's sentence is already being enhanced because he is a police officer. Something more is needed to enhance him again, other than merely his status as a rank and file officer. The court opinions discussed above seize upon the "or" disjunctive to separate "sensitive" from a high level decision maker. The purpose of the sentencing guidelines is to make individual assessments, not cookie-cutter determinations. The government did not set forth facts or claims in the Plea Bargain seeking this increase and it would be contrary to sentencing principals of tailoring a sentence to fit individual circumstances to just enhance the defendant's sentence twice merely because he is a police officer. Under this interpretation, in a bribery context, it would be hard to imagine a "public official" that is not in a "sensitive" position. The very nature of bribery is such that if the intent is to influence the public official to act, their position must be sensitive or there would be no real purpose in attempting to bribe the person in the first place. Surely the meter maid who is bribed not to write the ticket is markedly different than the police chief who is bribed to help cover up evidence of a major felony. Under a "status only" analysis, they are equally subject to the Level increase as "law enforcement officers". The *Richards* analysis, looking at the overall circumstances of the offender's position and the nature of the bribe appears to be consistent with sentencing guidelines rather than a mere mechanical "job title" cookie cutter approach.

**¶28 Entire Paragraph**

Objection: The Probation Department incorrectly concludes that (1) USSG §2C1.1(c)(1) applies in this case that the offense of conviction "was committed for the purposes of facilitating the commission of another criminal offense"; and (2) even if the said Guideline is applicable, the resulting Guideline calculation regarding an offense to facilitate drug transactions, when properly applying the Guidelines, does not yield an offense level greater than is determined for bribery under USSG §2C1.1.

///

LAW OFFICES OF                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                          SENTENCING MEMORANDUM

**A. Improper Use of the "Cross-over" Guideline of USSG §2C1.1(c)(1)**

As the first step in calculating the Guidelines range, a court must "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted)." U.S.S.G. § 1B1.2(a). Next, "[a]fter determining the appropriate offense guideline section pursuant to subsection (a) of this section, determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct)." *Id*. § 1B1.2(b). The term "offense," as used in the cross-reference, "means the offense of conviction and all relevant conduct under § 1B1.3." *Id.* § 1B1.1 cmt. n.1(H). Therefore, the cross-reference under USSG §2C1.1(c)(1) may be invoked if Harminder's offense of conviction "involved . . . unlawful manufacturing, importing, or trafficking (including possession with intent to commit these offenses); attempt or conspiracy involving controlled substances" or if Harminder's "relevant conduct" under § 1B1.3 involved these controlled substance offenses. USSG § 2D1.1. USSG § 1B1.3 (a) requires three elements to include "relevant conduct" in connection with a joint criminal enterprise

(a)  Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
**(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were-**
**(i)  within the scope of the jointly undertaken criminal activity,**
**(ii)  in furtherance of that criminal activity, and**
**(iii)  reasonably foreseeable in connection with that criminal activity;**
**that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;**

The first element of "scope" defines the voluntary activity the defendant *agreed* to undertake. In drug cases, the focus is upon what controlled substance and what quantity the

LAW OFFICES OF
MICHAEL R. BARRETTE

OBJECTIONS TO PSR AND
SENTENCING MEMORANDUM

defendant agreed to be engaged in as shown by the evidence. (*Id.* Application Notes 3.B defining "scope"; Illustration 4.(c) (vii).[1]  The Guidelines address the reverse-sting context by focusing on the "agreed-upon amount of the controlled substance to determine the quantity of drugs involved for sentencing purposes." § 2D1.1 Comment 5.

     In cases in which this cross-over has been used, the evidence applicable to the defendant showed that the defendant clearly agreed to take the bribe in exchange for an agreement to facilitate an agreed quantity of an agreed type of controlled substance. Thus, in *United States v. Solomon* (2014, 3rd. Cir.) 766 F.3d 360, the defendant, a town police chief, had specifically agreed to provide police protection for two drug deals in which the drugs (cocaine) and the quantities (first deal 5 kilos; second deal 10 kilos) were known and agreed to by the defendant as the purpose for the bribes. The Court of Appeal affirmed the far greater cross-over sentence for the drugs under Guideline § 2D1.1, as the quantity and drugs were established by the defendant's agreement to participate in these *known quantities.* (*Id*. at p. 365-366.) Indeed, the *Solomon* case collects then a number of other examples of the use of this cross-over. In each case cited, the defendant was shown to have knowledge of and agreed to the type of drug involved and the quantities his bribe would facilitate. (*Ibid*.)

     In the present case, the Plea Agreement and the stipulated facts drafted by the government are absolutely bereft of any agreement by the defendant to facilitate specific known transactions involving a known drug (cocaine) or any description of quantities. Neither the word "cocaine" nor any agreed quantities of cocaine appear anywhere in the Factual Basis for the Plea in the Plea Agreement. Nothing in the facts of the case ever demonstrates that Harminder knew the drug transactions involved cocaine or any quantities. Thus, there is no scope of Harminder's participation with known quantities of fake sales of cocaine. Harminder knew he was providing sensitive information, or at least making appear that he was doing so,

---

[1]  "(vii)  Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R. Defendant S is not accountable under subsection (a)(1)(B) for the other quantities imported by Defendant R because those quantities were not within the scope of his jointly undertaken criminal activity (i.e., the 500 grams).

LAW OFFICES OF                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                    SENTENCING MEMORANDUM

but the government concededly has no facts that would show more than the bribe activity. In short, if the government even remotely believed it could prove knowledge of cocaine and quantities by Harminder, it would have taken him to trial for that. The plea bargain alone belies any suggestion that Harminder knew he was facilitating distribution of cocaine in known quantities. Use of the cross-over under the circumstances of this case is improper.

**B. Even if Crossover is Proper, Guidelines Calculation Is Greater Under §2C1.1.**

USSG §2C1.1(c)(1) has a second requirement for cross-over. Assuming, arguendo, that Harminder's agreement to facilitate some unknown drug transaction is sufficient, the second requirement requires that the cross-over result in an "offense level is greater than that determined above. " In other words, the offense level for the drug transaction shown to be relevant conduct must be higher than the offense calculated under the bribery calculation. At a minimum, all parties agree that the minimum calculation of Harminder's offense level for bribery is Level 16, before adjustments.

Therefore, the resulting calculation level for a drug offense must be higher than 16 for the cross-over to apply. There is no evidence the government has relied upon in the Plea Agreement, or can otherwise rely upon to show that Harminder knew any drugs involved were cocaine or had knowledge and agreed to any particular quantities of cocaine. The only mention in the investigative reports of Harminder knowing cocaine was involved was an unreliable double hearsay statement from Rocky to the CI that Harminder knew the drug involved, but not any quantities. Parroting the same argument from above, Harminder is only accountable for drug species and quantities he agreed would be within the scope of his participation. Thus, merely knowing that some illegal drug was involved, without reference to type or quantities, would be a Level 6 under § 2D1.1. (Drug Quantity Table (17).) Even assuming, arguendo, cocaine being involved (and the defendant does NOT so assume), without an agreed quantity, the lowest level for an unknown quantity of cocaine is less than 50 grams, is a level 12. Thus, under the facts of this case, the use of the cross-over, in light of the evidence the government has presented as a Factual Basis for the Plea, the use of the cross-over, even if permitted, would result in a guideline calculation of an offense level *less* than the bribery guideline.  *United*

*States v. Mays* (2016 U.S. Dist. LEXIS 69641 (Attached) is factually similar to the case at bar. In *Mays,* the defendant was importuned by a friend to assist in the unloading of cargo containers containing "cocaine".  In fact this was a reverse-sting operation there was no actual cocaine.  While the defendant in that case knew the drug was cocaine, the District Court found that there was never any evidence that the defendant had agreed to any particular quantity of cocaine.  The Court concluded that absent evidence that would establish the defendant's knowledge or agreement as to a particular quantity of cocaine he believe he was unloading, the Court found the lowest level of cocaine in calculated the defendant's base offense level to level 12. While not binding authority, it should be viewed as persuasive.

Finally, due process considerations are involved here. It would be a violation of due process for the government to virtually concede in plea bargain documents that it lacks credible evidence to prove the cross-over drug offenses as to type of drug and quantities involved as to Harminder, sandbag him into a plea deal for the offense they believe in good faith they could prove at trial and then blind-side him at sentencing and claim that he is responsible for all levels of a grand cocaine conspiracy, while dismissing those counts.

The United States Court of Appeals for the Eight Circuit recognized that a defendant can be denied due process when relevant conduct is so disproportionate that it becomes the 'tail that wags the dog.' (*United States v. Wise* (8th Cir. 1992)  976 F.2d 393, 401(en banc), cert. denied, 507 U.S. 989 (1993), citing, *McMillan v. Pennsylvania*  (1986) 477 U.S. 79, 87-88. Indeed, prosecutors should not be able to indict for a relatively minor offense only to "pile on" disproportionate relevant conduct. (*United States v. Bacallao* (7th Cir. 1998) 149 F.3d 717, 721. ("[W]e again remind prosecutors 'not to indict defendants on relatively minor offenses and then seek enhancement sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted.'") (citation omitted). By parity of reasoning, this should apply to the plea bargaining process as well.

In this case the government chose to eschew any facts related to known type of drugs or specific quantities of controlled substances in preparing the factual basis for the Plea

LAW OFFICES OF                                          OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                              SENTENCING MEMORANDUM

Agreement. Adding a potential three-fold increase in Harminder's imprisonment range under the United States Sentencing Guidelines violates the Due Process Clause to the United States Constitution.[1]

Utilizing the *Hymas* factors identified above (*supra* at p. 5) these factors point to the Court being required to find "clear and convincing evidence" that Harminder knew he was facilitating cocaine transactions of at least 1 kilo in each of three (3) fake transactions. The factors and their relationships to this case are:

**(1) Whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment;** This factor is not applicable because even the enhanced Guideline range for 3 kilos of cocaine still falls under the maximum sentence of 10 years for the count of conviction.

**(2) Whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;** This factor is huge. Harminder is still presumed innocent of those charges and a mere preponderance of the evidence standard as a substitute for proof beyond a reasonable doubt would be inappropriate, in light of the evidence and the Factual Basis for the Plea Bargain. The prosecution chose to decline to prosecute Harminder for any drug charges.

**(3) Whether the facts offered in support of the enhancement create new offenses requiring separate punishment;** "Relevant conduct" is something slight different under the Guidelines, but is the functional equivalent. The Guideline level for Harminder is being "enhanced" such that the recommended sentence is greatly higher than without the additional information.

**(4) Whether the increase in sentence is based on the extent of a conspiracy**; This factor is applicable as the attempt is to tie Harminder in to a known drug conspiracy.

---

[1]  Harminder's counsel does not suggest in any way that the government has done anything wrong in this case. Harminder's counsel is convinced the government will concede the point that it has no factual basis upon which to apply the cross-over as to any drug offenses under the facts of this case as the bribery count yields a higher Guideline result. This is especially true since the government has in its possession the tape recoded meeting of March 8, 2015 and knows it does not reference cocaine nor any quantities thereof.

LAW OFFICES OF                                    OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                         SENTENCING MEMORANDUM

**(5) Whether an increase in the number of offense levels is less than or equal to four**; This factor is applicable. The Plea Bargain is for a Guideline of Level 13 whereas the additional information increases the Guideline to Level 23, or 7 steps higher.

**(6) Whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.** This factor is also huge in this case. The Plea Bargain calculates a Level 13 with a Guideline Range of 12-18 months. The use of the cross-over in this case results in a calculation of Level 23 or a Guideline Range of 46-57. At the lower end of Guideline range, this is an increase in the sentence of almost four times the length of the sentence.

Utilizing the factors above points to the Court having to find by "clear and convincing" evidence that as part of a conspiracy, Harminder knew and *agreed* that he was providing assistance to transactions cocaine involving quantities of at least 3 kilos. Even the Probation Officer wavers in his analysis of the strength of the evidence. In his Response to Objections by Harminder he states: "Nevertheless, even assuming, arguendo, that he is not held accountable for three kilograms, he would at the minimum be held accountable for the one kilogram of cocaine transaction discussed at the March 18, 2015, meeting between the CI, Gusharan and Harminder. PSR, ¶ 18." (sic) (*Id.* at pp. 8-9.) Of course, the details of that meeting contained in the police report where the CI claims Harminder was present when kilos of cocaine were discussed between the CI and Rocky is not only double hearsay, but the recording the Probation Officer was too unconcerned with to obtain or listen to fails to corroborate this concoction and demonstrates no such conversation ever occurred. The tape recording begins with the CI getting into his car and ends with the CI getting into his car and driving away. In between, there is never any discussion between the parties about cocaine or quantities in any "future" drug transaction.

The evidence fails to even preponderate, let alone be clear and convincing that Harminder knew about cocaine or any quantities and conspired to facilitate known quantities of cocaine.

| LAW OFFICES OF | OBJECTIONS TO PSR AND |
|---|---|
| MICHAEL R. BARRETTE | SENTENCING MEMORANDUM |

**Personal and Family Data**

¶52 Harminder volunteered at Hands of Hope in 2006 and 2007, when the organization had just began in this community. It is inaccurate to say that Harminder "never" volunteered for them. They likely do not have nor keep records going back that far.

¶75 The use of the word "termination" with regard to the defendant's employment is inaccurate. Harminder voluntarily resigned his position as police officer and was never terminated.

**Sentencing Options**

¶82. The offense level should be Level 13 with a guideline imprisonment range of 12-18 months.

¶86 The applicable guideline is in Zone C of the Sentencing Table,

¶95 The offense level should be Level 13 with a guideline imprisonment range of 12-18 months.

**Justification**

**"Although he has accepted responsibility for the instant offense, in a written statement, he appears to minimize his conduct by stating he did not know the codefendant was involved in illegal activities. "**

**Objection:**  This statement mischaracterizes the Defendant's Statement Regarding Offense supplied to the Probation officer. In that statement Harminder states he was initially unaware that Rocky was pursuing illegal activities. He goes on to accept responsibility once Rocky offered him money to carry out the façade of having a cop in his back pocket and accepted full responsibility for his acts that led to this conviction.

**"Phagura also wrote in his statement that he never received any monetary compensation for the bribes, only friendship from the codefendant.   The evidence seems to indicate otherwise."**

**Objection:**  No evidence shows Harminder ever receiving money from Rocky of the $6,000.00 paid by the CI to Rocky. Harminder accepts "responsibility" for this money, in the sense that since Rocky had offered him money, it was reasonably foreseeable that if he helped

---

Rocky that Rocky might be paid for that help. However, Harminder steadfastly maintains he acted solely for his love and affection for Rocky and their relationship and not for money.

**"It is also troubling that Phagura actually contemplated stealing money from other drug dealers on behalf of the CI. This case seems to be a simple matter of greed."**

 **Objection:** No evidence shows that this discussion went any further than laughing about it during a meeting at a restaurant. Harminder dismissed the notion out of hand as detailed herein. The idea, created by the CI was never pursued nor acted upon it in any way. To state that Harminder "actually contemplated" the idea, is misleading and inaccurate. There is nothing about "greed" involved in this case regarding Harminder. This is a case of misplaced loyalty. Succumbing to a request from a lifelong friend and mentor to abuse that position and implore Harminder to help him was more of a case of being importuned by love and affection for Rocky. Harminder played a minor role in this enterprise and was victimized by his friend in the name of friendship, that but for the friendship, this offense likely would never have occurred.

#### 4. 18 USC §3553 FACTORS.

 There are two ways to look at this case. At first blush, you have Rocky bragging that he has a "cop in his pocket", taking advantage of a lifelong friendship in conducting a drug deal while on a ride-along. This, of course, gets the attention of Homeland Security/DEA. They think they have a cop helping facilitate major cocaine transactions and set out to investigate. From Harminder's end, Rocky asking a lot of questions on a ride-along and asking him to run a license plate for someone that ran him off the road did not raise any red flags. But when Rocky offered him $2,500.00 to make it appear he was cooperating with Rocky to give sensitive information, Harminder had a life-altering decision to make. Unfortunately for him, he succumbed to admiration and affection for a mentor figure and agreed to go along with the ploy—to make it look like Rocky had bigger connections.

 What ultimately culminated was a recorded conversation of March 8, 2015 wherein Harminder met with the CI and Rocky and spoke in generalities about police procedures, local cops knowing when DEA was in town, making it appear that he could easily obtain intelligence from local NET-5 about operations and professing his help, "in any way I can". Nothing more

LAW OFFICES OF             OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE          SENTENCING MEMORANDUM

substantial than that, no tape recordings about kilos of cocaine, no involvement in any actual or simulated sales of cocaine. In short, a stupid cop who did a stupid favor for a friend that he knew better not to do.

The second possible way to view this case is Harminder is the kingpin cop of a major cocaine operation in Northern California. The Plea Bargain and the facts of this case belie that suggestion. Crimes of bribery, involving the sale of "information" do not always result in the seller of the information "knowing" how or for what purpose the information is going to be used. Harminder is guilty of assisting Rocky in selling information and appearances for a price…bribery and nothing more. The Plea Bargain accurately reflects the gravity of Harminder's conduct. Harminder is a human being and like others, let someone close to him convince him to do something under ordinary circumstances he would never even consider doing.

Admittedly, these are not the best times for police officers being involved in crimes as heightened public awareness has cast suspicion on law enforcement officers as a whole. But this Court should resist the immediate "knee jerk" reaction to public hype. In examining the §3553 factors, punishment of Harminder should reflect the exemplary life of the man before the court and his small blunder. Harminder made a small mistake that he is ready to pay for. But, Harminder can be rehabilitated and returned back to society as a productive citizen. The relevant §3553 factors are:

**(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;**

**(2)  the need for the sentence imposed--**

**(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

**(B)  to afford adequate deterrence to criminal conduct;**

**(C)  to protect the public from further crimes of the defendant; and**

**(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

LAW OFFICES OF                                     OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                          SENTENCING MEMORANDUM

**(3)  the kinds of sentences available;**

**(4)  the kinds of sentence and the sentencing range established for--**

**(A)  the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--**

**(5)  any pertinent policy statement--**

**(A)  issued by the Sentencing Commission**….

**(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and**

**(7)  the need to provide restitution to any victims of the offense.**

Focusing on these factors calls for a fair and reasonable sentence for Harminder. The defendant has led an exemplary life as a husband, father and police officer, except for this transgression. Harminder has been publicly humiliated and embarrassed and has had to face his wife, his family and all who trusted him and acknowledge that he let them all down. He has lost a lucrative job to be relegated to earning minimum wage to survive financially. He let down his community. He will be punished long after whatever the Court imposes by the looks and whispers as he lives in the community where he led his former exemplary life, from those who would not forgive, but would see him as the police officer who failed his office. Harminder should receive enough punishment, but no more than is necessary for what he did.

There are no future crimes to protect the public from Harminder. His life has been ruined; he is not a career criminal, this is his one and only transgression and he will spend the rest of his life atoning for that mistake. He presents no threat to society.

The circumstances of his case involved no "real" drugs, he provided only general information and never really followed through with any of his promises to "help" or obtain intelligence information from NET-5 files. The plea bargain and the resulting Guideline calculations therefrom accurately reflect the Harminder's true level of culpability.

There are many factors that make incarceration inappropriate for Harminder. Police Officers who are incarcerated are at a substantially increased risk of personal injury from the general prison population when they discover the inmate next to them is a "cop". Harminder

LAW OFFICES OF                                          OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                              SENTENCING MEMORANDUM

suffered a work-related back injury when participating defensive tactics training as a police officer. This produced a "huge disc herniation" for which the defendant received surgery, but was unable to complete rehabilitation due to losing his employment health insurance. This puts the defendant as having unresolved health problems which will impair his abilities as a prisoner and will reduce his ability to defend himself against those in prison who would attack cops, simply because of their status. This makes Harminder far more susceptible to injury than the average able-bodied police officer who goes to prison.

The assertion that Harminder acted out of greed is simply out of character for Harminder and does not square with the facts. Most telling is that during the recorded conversation of March 8, 2015, a period of time when Harminder obviously did not suspect he was being recorded, like Rocky had asked him to, he freely offers to "help in any way he can'. Yet, there is no mention of money, prices for information etc. It is natural to assume if Harminder were "greedy", money, as the motivating factor, would have been clearly discussed.

## CONCLUSION

In one sense, Harminder knows he has lost it all and nothing the court will do can hurt him any more than he has already hurt himself. Harminder is embarrassed and remorseful for what he has done. His most difficult task is to face his son and explain to him why "Daddy is not a police officer anymore." As his son gets older and understands the ways of society, that explanation will take on a purgatory of its own.

The government sees this as an incarceration case for 18 months. Harminder feels that he can be returned to society as a productive member and that he should be granted probation, with home detention or community confinement. As a condition of probation Harminder could be ordered to perform community service to give lectures to other police officers in training to use his case as an example to remind future officers that even though they have friends and close loved ones, they must always separate the badge from their personal life and keep the oath of the badge above all else. There are many ways that Harminder could continue to serve his community in service and rehabilitate himself and move on to a better chapter in his life. Society's interests have been sufficiently protected and exonerated by the pain, humiliation and

LAW OFFICES OF                                          OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                                SENTENCING MEMORANDUM

embarrassment Harminder and his family have already suffered. Harminder is not a criminal in the sense of the word we all understand, he violated the law and made a mistake. The court should consider all these factors in fashioning an appropriate sentence for Harminder.

Respectfully submitted,

DATED: November 4, 2016                    /s/MICHAEL R. BARRETTE
                                           Attorney for Defendant, Harminder Phagura

## CERTIFICATE OF SERTVICE

I certify that the within document was served on the following parties by electronic filing and the CM/ECF filing system in the United States District Court , Eastern District of California.

BENJAMIN B. WAGNER                    Anthony A. Andrews
United States Attorney                United States Probation Officer
PAUL A. HEMESATH                      501 I Street, Suite 2-500
Assistant United States Attorney      Sacramento, CA 95814
501 I Street, Suite 10-100
Sacramento, CA 95814

DATED: November 4, 2016                    /s/MICHAEL R. BARRETTE
                                           Attorney for Defendant, Harminder Phagura

LAW OFFICES OF                             OBJECTIONS TO PSR AND
MICHAEL R. BARRETTE                        SENTENCING MEMORANDUM

Document:United States v. Mays, 2016 U.S. Dist. LEXIS 69641

---

# United States v. Mays, 2016 U.S. Dist. LEXIS 69641

**Copy Citation**

United States District Court for the Eastern District of Pennsylvania

May 27, 2016, Decided; May 27, 2016, Filed

CRIMINAL ACTION NO. 15-158-1

**Reporter**

**2016 U.S. Dist. LEXIS 69641 ***

UNITED STATES OF AMERICA v. RONALD MAYS

## Core Terms

quantity, cocaine, sentencing, Guideline, unloading, agreed-upon, controlled substance, drugs, memorandum, presentence report, calculation, approximate, target, boxes, sting, kilograms of cocaine, guilty plea, appears, numbers, lenity

**Counsel:  [*1]** For USA, Plaintiff: JOSEPH T. LABRUM, III ▾, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, PHILADELPHIA, PA.

**Judges:** MICHAEL M. BAYLSON ▾, United States District Judge.

**Opinion by:** MICHAEL M. BAYLSON ▾

## Opinion

**MEMORANDUM**

At the sentencing of this defendant, who pled guilty to a so-called "reverse sting" narcotics charge, the Court upheld defense counsel's objection to the calculation of the offense level in the presentence report. In the parlance of law enforcement, a "reverse sting" occurs when an undercover police officer offers to supply drugs in return for cash, the target agrees, but an arrest is made when the target appears with the cash, and no transaction takes place. As an opera metaphor, picture Mimi, in Puccini's *La Boheme*, as a cop, knocking on Rodolfo's door to arrange a drug deal instead of just asking for a candle. Because of the unusual nature of the facts of this case and the possible novelty of the Court's ruling, this Memorandum will note the reasons for the Court's decision.

## I. Summary of the Facts

The defendant was employed as a longshoreman and worked on the docks of various steamship companies for a number of years. He was contacted by a co-worker who, unbeknownst to defendant, was cooperating with **[*2]** the Department of Homeland Security. The informant and the defendant agreed that the defendant would assist in unloading certain items of cargo that contained cocaine. This occurred over a period of several weeks, in three separate batches.

The defendant was indicted under 21 U.S.C. § 841(a)(1), (b)(1)(C), for attempted possession of narcotics, which alleged that he "knowingly and intentionally attempted to possess with intent to distribute a mixture and substance" of cocaine. The charge was only for "attempted" possession because, in fact, there was no cocaine in the bundles that defendant unloaded, although he was under the belief that the bundles contained cocaine. The defendant was paid a total of $12,000 for the first two unloading occasions, and after the third, received a payment of $12,500, which he then placed in a vehicle that he used to drive away. By prearrangement, a state police officer arrested the defendant and the money was seized. This seized money will be forfeited to the government, as it was advanced by Homeland Security.

The government's guilty plea memorandum (there was no plea agreement in this case) details the facts that the government gathered from the investigation. The government's narrative, **[*3]** which the defendant agreed was truthful at the guilty plea hearing, related in great detail the communications between the cooperating defendant ("CD") and the defendant leading up to the defendant's arrest. The Court does not question the validity of this prosecution and specifically finds that the defendant had sufficient *mens rea* to be charged with, and to support his guilty for, *attempted* possession. 1⬇

However, the government's memorandum does not contain information to support a finding that the defendant knew either the quantity of cocaine involved or what the value of the bundles he unloaded would have been if they had contained cocaine. There are no specific references about the quantity of drugs in the guilty plea memorandum. The government does mention some numbers discussed between the CD and defendant, dated December 2, 2013, before any of the actual unloading took place, as follows:

> The CD said that the group wants to 'send over five'. . . . It's like ten grand coming your way ($10,000 to be paid to Mays). For a day's work, that ain't bad money.

> And Mays retorted, "That's not bad at all" and asked when they planned to do it.

The government asserts the number "five" is a reference to kilograms of cocaine, but there are no facts indicating that the defendant understood that the use of this number actually referred to kilograms of cocaine. The government's memorandum also mentions other instances in which the CD mentioned numbers to Mr. Mays. 2⬇ The government, by the use of parentheticals, claims that these numbers refer to **[*5]** "kilograms of cocaine," but the record does not warrant the Court adopting that conclusion. There is no factual background that Mr. Mays himself was a drug dealer, that he was specifically told by the CD that the numbers the CD was mentioning referred to kilograms of cocaine, or that the defendant himself mentioned a number. Rather, the only indication that Mr. Mays had any knowledge of the drug industry appears in the probation officer's response to the defendant's objections to the presentence report. There, the probation officer mentions that Mr. Mays was targeted because the CD indicated that he and Mr. Mays "had worked for the same drug organization in the past." But that is the extent of the discussion of Mr. Mays' prior involvement with the drug trade.

The only dispute in prior delivery involves an amount of cash to be delivered to the defendant Mays. The guilty **[*6]** plea memorandum notes that after the first delivery "the CD gave Mays $6,000 in cash." There is no indication that this amount was negotiated between the CD and the defendant or that the defendant was ever told that this had any relationship to what the value of the cargo would have been if the cargo had contained cocaine. There is no dispute that Mr. Mays was paid $6,000 in cash after the second delivery, and $12,500 after the third delivery.

## II. Application Notes

The Application Notes to the Sentencing Guidelines play a critical role in determining the sentence in this case. These Application Notes are binding in most circumstances. *Stinson v. United States*, 508 U.S. 36, 43, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993). **3⬇** Commentary, which includes the Application Notes, **4⬇** should "be treated as an agency's interpretation of its own legislative rule." *Id.* at 44. Thus, "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38. "Failure to follow such commentary could constitute an incorrect application of the guidelines, subjecting the sentence to reversal on appeal." U.S.S.G. § 1B1.7.

The presentence report aligned with the government's position because both relied on U.S.S.G. § 2D1.1, Application Note 5, which indicates:

a) Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of controlled substance.

b) In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level . . .

c) . . . in a reverse sting, the agreed-upon quantity of controlled substance would more accurately reflect the scale of the offense because the amount delivered is controlled by the government and not **[*8]** the defendant.

The presentence report calculated the defendant's offense level at thirty (30), accepting that Mr. Mays's conviction involved twelve (12) kilograms of cocaine based on the government's representation that the numbers mentioned by the CD to the defendant were representative of kilograms of cocaine.

## III. Contentions

Defense counsel objected to the probation office's calculation as improper because there was no "agreed-upon" quantity, and thus, Application Note 5's reference to the "agreed-upon quantity" was inapplicable. The CD merely mentioned numbers rather than actual amounts of cocaine, and the defendant had no basis to know what the quantity or value was. Furthermore, defense counsel argued that, in this "reverse sting" type of prosecution, there should be no quantity attached to the unloading because there was, in fact, no cocaine in the shipment. *See* U.S.S.G. § 2D1.1(c). Thus, defense counsel argued that the offense level should be twelve (12), because that is the lowest computation for the offense to which defendant pled guilty, under Guideline § 2D1.1, as set forth in § 2D1.1(c)(14). Level 12 is for a mixture or substance containing a detectable amount of cocaine that is less than 50 grams.

The base offense levels **[*9]** suggested by the government and the defense, therefore, have a very high variation of eighteen (18) levels. The Guideline range under the government's theory, which was adopted by the presentence report, was 57-71 months. But the Guideline range for the calculation using the defendant's suggested offense level of 12, after other deductions, was Level 8, or 0-6 months.

From the bottom of the guideline range, the district court thus concluded that Mays should be at level 12, and accordingly, sentenced him to six months imprisonment.

## IV. Determining the Drug Quantity

At sentencing, the government must prove the quantity of the controlled substance by a preponderance of the evidence. *United States v. Raven*, 39 F.3d 428, 434 (3d Cir. 1994); *United States v. Reyes*, 930 F.2d 310, 315 (3d Cir. 1991). Once Mr. Mays submitted objections to the presentence report, the government was on notice that satisfying its burden may require more specific evidence than it had stated in the guilty plea memo or the presentence report, but it did not do so.

### A. "Agreed-Upon Quantity"

Application Note 5 5 to U.S.S.G. § 2D1.1 calls for a sentencing judge to "approximate" the amount of controlled substance. Specifically, the Application Note indicates that the appropriate amount in reverse-sting cases will be the "agreed-upon quantity."

Because of the guidance in Application Note 5, the calculation of the amount of controlled substances in a reverse-sting scenario is typically a straight-forward task because the defendant usually explicitly agrees to an amount to be bought, sold, or transferred. But, in what appears to be a novel factual situation in this circuit, the government has failed to show that there was an agreed-upon amount.

To support its articulation of the amount of cocaine involved, the government quotes the discussions between the CD and Mr. Mays. But these quotes are of coded discussions and do not contain any explicit references to drug amounts. According to the government, the CD was speaking with the defendant in code to appear to avoid detection by law enforcement.

The only other evidence that might support that there was an agreed-upon amount, or even that Mr. Mays was aware of how much cocaine he was handling, came from a conversation between the CD and Mr. Mays following the last pick-up. Mr. Mays had picked up two separate boxes that he believed contained cocaine. According to the government: **[*11]** "[Mr. Mays] pointed out that one of the boxes was bigger than the other, noting that there were four in one of the boxes. The CD corrected Mays and told him there were three in each box. Surprised, Mays responded, '[t]hat's gotta be small a** bricks.'" (ECF 28 at 7.) This evidence is too vague to persuade the Court that there was an agreed-upon quantity between Mr. Mays and the CD.

As a result, the Court finds that Application Note 5's guidance regarding "reverse stings" is inapplicable to the facts here. The Court believes that Application Note 5's "reverse sting" instruction was directed towards a person who is a drug dealer and would have some understanding of the drug business so that they would realize the seriousness of the crime that they were committing. To be sure, it can be characterized that the act of unloading cocaine from a ship is an important link in the chain of custody from the origin of drugs to their being distributed by drug dealers, but that situation is not this case. Without any evidence from the government that this defendant was accustomed to dealing in drugs, or was part of a conspiracy to distribute drugs, the Application Note does not apply to this type of evidence. **[*12]**

### B. Quantity Calculation Absent an Agreed-Upon Quantity

Given the lack of an agreed-upon amount, the Court is left to approximate the amount of the controlled substance using other methods and factors. *See* U.S.S.G. § 2D1.1 App. Note 5; *United States v. Clark*, 419 F. App'x 248, 250-51 (3d Cir. 2011) (unpublished) (reciting, in a case involving a reverse sting, that "[w]here there is no drug seizure, the sentencing judge is to approximate the quantity of the controlled substance," but applying the "agreed-upon quantity" rule). In doing so, the Court is aware that some courts have expressed concern about the

government concerning a purported agreed-upon quantity, or any evidence of an agreed-upon amount. *United States v. Solomon*, 766 F.3d 360, 366 (3d Cir. 2014). The Court is also guided by the rule of lenity. *See United States v. Flemming*, 617 F.3d 252 (3d Cir. 2010) ("[The rule of lenity] applies to the Sentencing Guidelines.").

There are no facts on which this Court, in good conscience, could rely to conclude that Mr. Mays trafficked any quantity at all. There was no actual possession of drugs, which is why the defendant pleaded guilty to an offense of "attempted possession." There are no facts indicating that the defendant agreed to any amount or value of cocaine. And, the government has not presented any evidence indicating that Mr. Mays was aware of the government's purported **[*13]** quantity. Thus, the Court cannot rely on the amount of actual cocaine unloaded, an agreed-upon amount, or evidence indicating what quantity Mr. Mays believed he was unloading.

Furthermore, it would be very unfair, in this Court's opinion, to adopt a Sentencing Guideline Offense Level commensurate with the value or the quantity of fake drugs in this case. Mr. Mays was being paid only for unloading. As such, unlike a buyer or seller, he would not have a clear picture of the amount involved in the transaction as he never needed to lay eyes on the "drugs." There is no evidence that the amount that he was paid for the unloading the boxes had any relationship to the quantity of drugs, much less that he knew of any relationship between the amount he was unloading and the payment he was receiving. It is also reasonable to believe that the defendant thought that the cocaine was hidden within the boxes he was unloading, and therefore the size of the boxes fails to provide a basis **[*14]** on which to estimate the value of the cocaine.

In light of the foregoing, the Application Notes fail to provide a mechanism by which this Court could determine the amount of cocaine involved. When "there is a *grievous* ambiguity or uncertainty in the statute," the rule of lenity is triggered. *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010). This rule requires that such uncertainties be resolved in favor of criminal defendants when the "ambiguity in the criminal statute cannot be clarified by either its legislative history or inferences drawn from the overall statutory scheme." *Id.* at 269.

This case triggers the rule of lenity only because the government has failed to present facts that would allow the Court to fairly calculate the amount of the controlled substance. That failure has revealed a gap in the Application Notes, which are binding when applicable. *Stinson v. United States*, 508 U.S. 36, 43, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993). On the one hand, according to the Application Notes, the Court is required to approximate the quantity. On the other, the Court's approximate quantity should have some basis in reality, and the government has failed to show any evidence that would permit the Court to find any quantity of drugs. Thus, this Court is left with a unique situation in which the statutory requirements for attempted **[*15]** possession are present, but there is no evidence on which this Court could base a good faith estimate of the quantity involved. In light of this uncertainty, the Court believes that the only way it can balance its statutory duties with the defendant's entitlement to due process is to find that the quantity in this case is zero (0) grams.

For all these reasons, this Court believes that there is no basis upon which the Court could approximate the quantity of the controlled substance. Because the government has failed to meet its burden of proof, and considering the rule of lenity, the Court finds that the quantity of cocaine in this case is zero (0) grams.

## V. Conclusion

From the bench, this Court held that the defendant's base offense level should be reduced to Level 12. Therefore, the Court sentenced the defendant to a six-month sentence, within the 0-6 month Guideline range.

The Court recognizes that it could have adopted the presentence report and then readily given the defendant a "downward variance" from the Guideline range. That would not have captured what the Court feels is a measure of "sentencing overreach" in a very unusual factual situation. Given the relatively minor nature **[*16]** of this offense, compared to the serious trafficking in drugs by dedicated and committed drug gangs, the Court must wonder why the Department of Homeland Security was fronting over $24,000 of public funds to capture Mr. Mays, surely a minor player by any standard. The Court decided to prepare this memorandum in case the government appeals or for the Sentencing Commission to consider whether to revise the Guidelines to cover this unique factual situation.

The defendant was also sentenced to pay restitution of $12,000.00, which is the amount he had been paid after the first two unloading events.

The Court Case 2:15-cr-00095-GEB Document 68 Filed 11/05/16 Page 37 of 38tirement account, defendant is required to show cause why he should not reimburse the Defender Association for the value of services, consistent with *United States v. Konrad*, 730 F.3d 343 (2013).

**BY THE COURT:**

/s/ Michael M. Baylson ▾

**MICHAEL M. BAYLSON** ▾, U.S.D.J.

---

**Footnotes**

 Although the Court does not question the validity of the prosecution, it does cite one additional piece of information that supports the court's view that defendant was not involved in drugs. Based on the defendant's sentencing memorandum, it appears Mr. Mays was interested in cooperating with the government, but the fact he was not known as a drug dealer prevented this:

> [Following his arrest, o]n more than one occasion [Mr. Mays] agreed to wear a wire and to meet with a target of the government's investigation, another dockworker. Unfortunately for the government and for Mr. Mays the target was extremely wary of Mr. Mays with whom the target had little prior relationship. The target did not engage in any conversation regarding the smuggling of cocaine. At the time of his attempts at **[*4]** cooperation Mr. Mays was still uncharged.

(ECF 28 at 2.)

 For example, the government quotes the following passages from recorded conversations between the CD and Mr. Mays, claiming that these passages are referring to cocaine quantity: "like five, six, seven, around that ballpark," "the store opens at 7," "needed six of them," and "three and three." (ECF 28.)

 Although *Stinson* pre-dated *Booker,* **[*7]** *Booker* appears to have had no impact on *Stinson's* holding about the binding nature of the commentary. *United States v. Kluger*, 722 F.3d 549, 556 n.10 (3d Cir. 2013) ("In *Stinson v. United States* the Supreme Court explained that the commentary not only clarifies the guidelines but also 'provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.' Though the guidelines are no longer mandatory, we still look to the commentary when we calculate the guideline sentence as we would have pre-*Booker*." (internal citations omitted)).

 *See United States v. Kluger*, 722 F.3d 549, 556 n.10 (3d Cir. 2013) ("[T]he commentary's application note 2 reads . . . .").

 This appears to have previously **[*10]** been Application Note 12. *See United States v. Smack*, 347 F.3d 533, 538 (3d Cir. 2003) (quoting the language of the current Note 5 and attributing it to Note 12).

 Case 2:15-cr-00095-GEB   Document 68   Filed 11/05/16   Page 38 of 38

The government might have shown, for example, that the defendant had a long history in the drug trade such that he would have known how much cocaine he would have to unload to earn $6,000 for unloading it. But it did not.



**Content Type:** Cases

**Terms:** 2016 U.S. dist. LEXIS 69641

**Narrow By:** -None-

**Date and Time:** Oct 21, 2016   05:41:07 p.m. PDT

LexisNexis®    About LexisNexis®    Privacy Policy    Terms & Conditions    Sign Out

Copyright © 2016 LexisNexis. All rights reserved.

RELX Group™